Case number 25-7080, Democracy Partners, LLC, et al. v. James O'Keefe and Allison Maas, Appellants. Mr. Ballmer for the appellants, Mr. Sandler for the employees. All right, Mr. Barr, good morning. May it please the Court. Good morning, Your Honors. My name is Benjamin Barr, and I represent the appellants James O'Keefe and Allison Maas. I'd like to reserve three minutes for rebuttal. No nondisclosure agreement, no salary, no authority, just an unpaid intern clipping newspaper articles, saving videos, taking messages. This is who Allison Maas was inside Democracy Partners, the lowest rung on the ladder. Yet because she recorded what she saw and later shared it with the public, the verdict below reimagines her as three things at once, a fraudster, a fiduciary, even a potential criminal. This inversion of reality should give pause to this Court. If accepted, the appellee's theory would allow New York Times v. Sullivan to be nullified by creative pleading. Fiduciary law is meant to restrain those with power, not to conscript the powerless into silence. Fraud is meant to remedy harmful deceit, not to punish truthful exposure. And the First Amendment does not tolerate a regime in which the least powerful person in the room is transformed into the guardian of Washington's political secrets. This Court should restore common sense and reaffirm the constitutional principle that journalists may not be punished for truthful reporting simply because the truth was uncomfortable. Now, in doing so, I remind this Court of its duty under Bose Corp. to be a constitutional gatekeeper and to apply a clear and convincing evidentiary standard to the record below. That means the findings should be supported by a high level of probability without hesitation. And that's in looking to reaffirm the role of New York Times v. Sullivan in requiring that defamation claims not be repackaged into other torts. We start with the first claim, which is fraudulent misrepresentation. My understanding is that there was no objection below to the jury instructions on fraudulent misrepresentation. That's correct, Your Honor. And those jury instructions made clear that the verdict wasn't based on publication. It was based on infiltration, right? Yes, Your Honor. So what's the First Amendment problem? The First Amendment problem is this should not have gone to a jury at all. As a matter of law, it should have already been decided in favor of the appellants. And this was raised both at motion dismissed and re-judgment, Rule 50A, Rule 50B. So you're saying infiltration can never be the basis of a fraudulent misrepresentation claim? No, I'm not, Your Honor. What are we saying is that the harm that stems from misrepresentation has to arrive directly out of that infiltration or misrepresentation. But where there are publication issues in front, where there's news gathering involved, if the alleged harm stems from the publication, then we have a profound First Amendment issue here. And the timeline in the joint appendix that was— You're saying that you're the base of any damages on infiltration, not publication, right? Correct. There was no objection to the jury instructions. But the Rule 50A and 50B did preserve that argument. But the jury instructions said the damages are to be based on infiltration, not publication. Yes. So, again, if that's the case, where's the First Amendment problem? The First Amendment problem is that it should never have gotten to the jury. And I think if we just do a brief walk through the timeline, it shows that this is related to the publication. Ask me, the association— People have said that merely because in a situation like that there may be some relation to a publication is not dispositive. Correct. You've made that very clear. Yes. All right. So, I mean, that's an uninteresting starting point when you say related to a publication. So what? That's a fact that the jury understands and the instructions accounted for. And the Supreme Court has said, don't worry about it. That's not an issue as long as you find what is required here. And the district court instructed quite precisely and quite clearly over no objection. The thing that's missing here is you're missing completely the standard of review. You know, the standard is not favorable to you. And the Boe standard on malice is not in play here. I'm reading the case law. I can't take it where you're trying to take it. It's just not in play. I would respectfully disagree. Of course you would. But I want you to at least understand I don't see how you're getting there. Yes. Well, I think if we look to what's occurred in sister circuits, in the Fourth Circuit and Food Line, Seventh Circuit in Desnick, Ninth Circuit in Newman that was cited in our briefings, that we do get there. And under Boe's court, it is the duty of this court to look not just at the jury's finding, but the record as a whole to be able to examine this for First Amendment violations. And if I may, I'd just like to walk through. There are some cases in which the court says we're always in play because they've categorically put those cases in play, the Boe's type situation. For the most part, that is not true. But we have acknowledged that in situations that appear to raise a particularly difficult kind of issue, we should at least be careful to make sure that nothing problematic has occurred here. That doesn't get you where you want to be. You want to just sweep this under the Boe's rule. That's not correct. It's not the novel review. Well, it's not sweeping. It's that these arguments about that the jury should not have received this, should not have acted on this, were preserved in the 50A, 50B summary judgment arguments. And if I may, I'd like to walk through the timeline to be able to explain why we think that's compelling. AFSCME, who's the major funder of the source of damages here to Strategic Consulting, to Americans United for Change, they were not contacted about this investigation until October 17th, the very date of the publication. It doesn't matter. I mean, that's what the Supreme Court case said. It doesn't matter. The Supreme Court case, are you referring to your own? Keep going. I'll give you what I want. Sure. Shortly after Veritas publishes the video, that is when AFSCME terminates the contracts that are in question with Strategic Consulting, Americans United for Change, Scott Fray, who's the head of AFSCME, testified that his main concern was the video created the census scandal. He testified it was an unfortunate distraction because of the optics of the presidential election. Cohen. Cohen v. Collins, yes. A generally applicable law doesn't violate First Amendment standards for journalists. The fact that the time sequence doesn't fit the way you're suggesting it doesn't make their case infirmed.  Can you restate that? You're saying because it got noticed, the publication came, in your view, after the fact, after some fact. That means conclusively, in your view, that's the end of it. That's not what Cohen's saying. That is what Food Lion does now. That's not what Cohen's saying. Cohen's saying just the opposite. Cohen says that we look to laws of general applicability in that those don't defend the First Amendment for some special journalistic immunity. And we're not arguing in favor of any sort of journalistic immunity. We're arguing about proximate cause here. And that where there's an intervening publication that causes the damage at issue, that you have to meet New York Times, DeSullivan standard. Otherwise, you're maneuvering around, just as Hustler said, and that can't be done, whether a jury's blessed that or not, as a matter of law. That's where we're at. And the fact that this is a publication damage tracks, with clock-like precision, the exact timeline here. And it's similar to what happened in Food Lion. It's not like what happened in Newman in the Ninth Circuit. That was David Daleiden with the Center for Medical Progress, where a pro-life investigative journalist went in, and there's evidence produced that right at the time they discovered the infiltration, they took measures to upgrade their security system. They brought in tech consultants. They spent money. But what happened here was that, you know, and we tried to point this out in the reply brief, that there is the standard sort of born out of Food Lion reading Hustler, is that in a world where there's no publication, if there are no damages, then there's nothing that's compensable here. And to do otherwise would be to have an affront to the First Amendment. I don't understand what you said at all. You're telling me that if there's an infiltration and the organization finds out about it, but there's never any publication, then there just wouldn't be any damages? There has to be an immediate concrete harm in terms of looking at proximate cause at that time. So in Newman, there were security upgrades, tech upgrades, that were put into the record shown as evidence that supported that harm. We could imagine corporate espionage where Pepsi sends an individual in and steals a trade secret from Coca-Cola, and there's immediate harm at that time. But where the record shows that there's been a publication, and that it's embarrassment in a result of that publication, as we had in Food Lion, where two undercover reporters there actually worked in an organization, Food Lion, showed that the meatpacking had problems and the like, when we see that the timing relates to publication, not the actual infiltration, then we have a problem. So here there was evidence from AFSCME that part of the reason that they dropped Democracy Partners was the infiltration? There's passing reference to that. But under Bose, the burden here is to be able to show without hesitation and with convincing clarity that the actual damages stemmed from that infiltration. And when we compare this to Food Lion, Desnick, Newman. And the jury was instructed that the damages have to be on infiltration, and the way that they were instructed was not something that your client objected to? Was not objected to. They did not. At the same time, the jury decided this incorrectly. We don't believe it's a matter of law. It's a very high standard for you. That's what I start out by saying. It's a very high standard, but you're arguing it as if you just made a statement that it has to be clear and what are you going to call the jury and say, were you really clear? Of course not. That's not the way we review this evidence. The question is whether the jury was dealing with something that should have been in their hands, whether they got instructions that were permissible and they were not objected to here and they otherwise looked permissible, and whether there's something at a very high standard that suggests the jury got it completely wrong. I don't know where they got it completely wrong. When I look at Cohen and some of this other material, it was within the range that they could have reached, and that's it. And there are lots of cases where folks come away saying, you know, but I don't really like the jury result. And I have a good argument. Maybe, but if the jury did what it was supposed to do and they were properly instructed, you lose. And here the jury didn't do what they were supposed to do. Cohen stands in tension with cases like New York Times v. Sullivan and Hustler. Hustler reminds this court that- Cohen takes care of your so-called Hustler argument and you have no answer for that. Well, the answer is twofold. One, that it shouldn't have gone to the jury as a matter of law. I understand you say that. Yeah, and this court is a constitutional gatekeeper, has its own duty to review the whole record below and to see that the damages were tied to publication, not to the infiltration. Second, that we meet the highest- It's part of the instruction. Second, that we meet the highest standard here, that when we look at this timeline that I just walked through, this lines up perfectly with Food Lion. It lines up perfectly with Desnick. In other sister circuits, finding that where the evidence points towards a finding that the harm comes out of embarrassment from this publication, then we have a Hustler problem, a Food Lion problem, and the like. I see that my time is up. I don't know if you want me to address the fiduciary issue or wiretapping claims or save that for rebuttal. Well, it would seem that anything you want to say about that needs to be able to be responded to by the other side. Okay, I'll keep it short. Your Honor, yes. We turn to fiduciary duty and the finding of a fiduciary duty owed by Alice and Moss to democracy partners. That, of course, is the predicate for the wiretapping claims here. Of course, in D.C., it's an open-ended test. That doesn't mean a boundless test. What is the nature of the relationship, the promises made, the types of services or advice given, legitimate expectations of the parties? But immediate problems here are that fiduciary obligations arise only in rare relationships of heightened trust, independence, where one party proposes a special confidence in the other and the other accepts that, sort of a meeting of the minds. Moss was a temporary, unpaid intern, not an officer, not an advisor. She wasn't entrusted with managing any sort of affairs. She had no contract, no confidentiality agreement, no decision-making power within the organization. Fact issue, right? Fact issue, right? Well, it's also – Is it a fact issue? Yes, there is a fact issue. And there were instructions given to the jury and they were based on established law, and so the jury was instructed, here's the evidence, here's the law, here's what you have to decide. The jury decided it. Now, where was the jury wrong? Because you don't like the result. That's not the way we operate. Because the bar, the legal bar for fiduciary duty has been deliberately set very high, and where the constitutional issues, the First Amendment issues here are implicated, again, under Bose, this court has its own special duty to reserve that. We provided a survey of nationwide law and fiduciary status simply because fiduciary case law is very sparse. Even mid-level managers usually don't have a fiduciary duty. Even exposing confidential information to an individual usually doesn't trigger any sort of fiduciary – Depending on the circumstances. That is correct, Your Honor. It's not the mere fact of anything in particular in the case. It depends on the circumstances as a whole. That's what the law is. And the things that the jury has to take into account, which as far as we have reasons to know they did, because they were instructed properly. And as a matter of law, there has to be clarity given to undercover journalists to be able to know in advance when they're able to record and when they are not. And when we introduce multifactorial tests, as we have here, cases like Citizens United before the Supreme Court warn against the inherent vagueness in this. And they inhibit a chill in journalists in terms of being able to figure out when they're able to do this and when they are not. But there is decided case law, both in D.C. and throughout the country, that this is a very high standard to meet. It's very rarely met. CEOs, accountants, financial fund managers, low-level interns. Now, the evidence below, there's three. There's an intern who works for a representative or a senator. Do they have a fiduciary relationship with the representative or senator? Well, we look at the test that's available in D.C., nature of the relationship. That would tend to heighten the level of duty that we would find there. We would have to examine what promises were made between the parties. As a person in this situation raised by my colleague, would that person assume that it's perfectly permissible in that kind of a job situation, whatever its title, I can record everything that goes on here and share it with whomever I want to to my advantage? You think they wouldn't understand that's probably a problem of a serious sort? I think they would probably understand that, Your Honor. Right. Well, that's what we're looking at here. That's what the jury had to decide. The record below has three mentions of anything that can be considered close to this. No one at Democracy Partners mentioned an inherent role of confidentiality. There's nothing in the record below for that. These are the people to whom we work, with whom we work, and the kind of work we do. And you walk out of the room and say, good, I'm going to record everything I hear here, and I'll share it as I please. And then I can get away with it because I'll say it's First Amendment protected. Oh, come on. Well, yes. No, Your Honor, absolutely yes. That's what investigative journalists do, and that's why major reforms. They do, but sometimes they may take a chance. That's what this case is releasing. It has to be within the law. It has to. But there may be a risk. We're not arguing any sort of special journalistic immunity. Right. The Supreme Court has said you can't win on that. No, we can't. Absolutely not. But what we can win on is the fact that this is, again, related to publication damages and that the finding of a fiduciary standard here is absurd. Again, the record below, the DNC staffer, Jenna Price, she said that there was a bus tour. That was kind of a secret. There was a teleconference call that discussed a secret war room used by Hillary Clinton, and Aaron Black said no one is supposed to know about him. Aaron Black also said that there would be an NDA or something like that, maybe, given to Allison Moss, to which she said, okay, the terms of which were never known and was never produced. That doesn't suggest a situation in which confidentiality is guarded very well. It suggests a very porous and open – Counselor, you're in a bad situation on the facts, and I'm just thinking in terms of what the jury might be thinking. She recorded everything with the intention to use it to my advantage as I see fit. That's what we're talking about here factually. Everything. It wasn't I'm going to pick and choose, and so there could be a fight over a bus trip. That's not what's going on. I'm going to tape everything, and then I'll use it to my advantage. And the jury said you obviously had to understand there was some fiduciary responsibility that you breached. Well, her advantage was to inform the American public about a newsworthy event, about bracketing events, putting individuals into campaign rallies to foment violence. This was reviewed by 6.7 million viewers. It was very much a popular piece by Project Veritas. And you and I both know that's not dispositive. That doesn't answer the question. It speaks to the newsworthiness of the action. That doesn't answer the question, and that's what Cohen and other cases have made very clear. The news doesn't get a pass if you're otherwise in trouble with other pieces of the law that we value highly. So the question here is there a breach of fiduciary relationship where you knew that in this context certain things were not meant to be shared or taken from here, and that's not unlawful, and you had reason to know that was the case and you breached that. There is no misrepresentation of who you are and what you're about. There is no evidence in the record, Your Honor, that she was told that this was to be kept confidential.  That's simply not there. Let me ask you a question that, unless I'm misreading the record, whether this Ms. Maas was a fiduciary or not, and I don't think she was. If she was, then that's the end of muckraking. But this video came from the people who talked to this guy named Fovle. Yes, Scott Fovle. I mean, they didn't use anything that Maas, am I correct? That is correct, Your Honor. There's nothing from Ms. Maas included in this first video that's the subject of this litigation. Well, that seems to me to be pretty important, that the injury was not caused by her undercover irrelevant reporting or recording and videoing and so forth. I think that's true, Your Honor. It's also noteworthy that its democracy partners bringing this suit, she had no knowledge about the inner workings of AFSCME, a strategic consulting group of Americans United for Change. Those were downstream third-party contracts. And the video here in question, as you noted, there is no— If you assume, which I do, if you conclude that it's the video that caused the harm, not the so-called infiltration, then what she did or didn't do is irrelevant. It's what this fellow— What was the guy who also had an alias, Hartsock or Hartstock? Oh, Christian Hartsock, yes. He was the actor in the main video who went out to Wisconsin to record Scott Fovle talking about hiring the homeless to do awful things and foment violence. I take your point, Your Honor. Yes, it's absolutely important. And to your point, this does— This determination by this court decides whether undercover reporting can exist in the nation's capital moving forward. And we'd ask that you reverse and remand accordingly. I do have one question. Oh, yes, Your Honor. You agree that Kramer is a limited-purpose public figure. Yes, Mr. Kramer is well-known, involved in political circles, is married to a former congresswoman from Chicago. I think that adequately meets New York Times' desolvent public figure status test. Thank you, Your Honor. Thank you. We'll give you some time to reply. Mr. Sandlins? Thank you, Judge Henderson, and may it please the court. Defendants claimed in their reply brief, and counsel alluded to it, that if the verdict in this case is allowed to stand, it would, quote, set a dangerous precedent, effectively ending undercover reporting and investigative journalism. Mr. Sandlins, I'm very hard of hearing. Could you either get close to the mic, get closer to the microphone, or get it closer to you? Can you hear me now? That's better. Okay, thank you. Defendants claim in their reply brief that if the verdict in this case is allowed to stand, it would, quote, set a dangerous precedent, effectively ending undercover reporting and investigative journalism, end quotes. And leaving aside that this verdict has stood for more than three years with no noticeable effect on investigative reporting or journalism, that assertion is simply not true. And it's not true because with respect to the fraudulent misrepresentation count, the district court, two different judges who presided over this case, indeed kept the First Amendment constraints, the Hustler Doctrine, top of mind, such that in the words of the district court itself, that court, quote, this only permitted plaintiffs to proceed to trial with claims predicated on harms caused by defendants' non-expressive conduct. In particular, the jury was carefully instructed to that effect, as the counsel's exchange with Judge Wilkins noted, and defendants do not challenge those instructions in this appeal. The non-expressive conduct that was found to be a proximate cause of the damages sustained by Mr. Kramer and his company was the infiltration by Ms. Moss of the offices of Democracy Partners. And that included not only access to the private offices in that company, but also inside the headquarters building of the Democratic National Committee and of a major labor union. Evidence showed that the access was all made possible by an elaborate web of falsehoods and misrepresentations, and that in the course of that infiltration, Ms. Moss videoed literally everything she saw and heard all day long, without regard to whether the person she was taping was the subject of any journalistic interest, just taping everything to see if anything interesting turned up, including people she didn't even know who they were when she started the day. And nothing did. Nothing that she recorded or taped or looked at or whatever was the subject of a publication. That is, yes, that is true. That is true. And that's right. The actual contents of the video were virtually entirely a conversation with Mr. Foval recorded in a bar, with Mr. Kramer in a hotel lobby and in a restaurant. We didn't challenge any of that because it didn't, that wasn't, had we challenged that, say that was embarrassing and you selectively edited it, then we would have had to meet the Hustler standard and show and tried it as, you know, pleaded it and tried it as a defamation case. But that wasn't the case here. The jury found that a proximate cause was the infiltration itself. And if the issue was whether a reasonable jury could have found with all inferences resolved in claims favor, that a substantial factor in the decision of AFSCME to cancel its contract with Mr. Kramer's company, Student Consultant, was the fact of my- Director of Government Affairs. And he testified that he was separating his outfit from the story unfolding around the rigging of the election video. His main concern was with the optics of the video and the time that it came out. It wasn't about intrusion or infiltration. Right, but the- I know he also said they didn't properly vet her. But Claiborne says if there's a First Amendment cause that is the dominant direct cause, that's it. If there are other things floating around, that's what you look at. Claiborne says that, and that to me answers the question. I do have a question. Do you also agree that Kramer is a public figure, limited-purpose public figure? Yes, I agree. But, again, the jury was instructed, and the issue was whether it was a proximate cause, not the only cause, or the principal cause of the damages. And Mr. Frey testified when I asked him, did you have a concern that Mr. Kramer created the opportunity for this video by allowing the operation to have occurred? We did have that concern. As you know, whether or not there was appropriate vetting of the staff, whether or not they had been thorough in their background review. Was the infiltration of Democracy Partners by Project Veritas operative a factor in your decision to terminate the relationship with Mr. Kramer? Yes. The fact that the- Rhonda, do you think if the video had not come out, and that this Ms. Moss just had all this collected stuff, and she either kept it or gave it to O'Keefe, that this organization that Scott Frey heads up would even know about it, would have any reason to cancel the contract? It would be speculative whether Mr. Kramer would have mentioned the- well, actually, if the video had not come out, they wouldn't even know that the whole thing was a- the whole internship was a fake. But the mere fact that AFSCME learned about the infiltration from the video doesn't mean that that was expressive conduct that causes the damages. Just as in the Planned Parenthood versus Newman case in the Ninth Circuit, everyone learned of the infiltration from the video, but the damages, as the Ninth Circuit found, were caused by the infiltration itself, the cost of security measures. It's like saying- this is not a but-for test under Hustler. It's whether the damages flow from the contents of the publication made you look bad. It's a defamation case. It can't be the case that merely learning from it makes it expressive conduct. It's like saying if you- you know, somebody broke into my house and recorded themselves and posted it on the Internet, I couldn't go after them because I only learned it was them, you know, from the video, but I'm actually trying to recover damages for the break-in itself. Turning to- Let me ask you one thing. If you were to lose on the fiduciary relationship question, are you still in play? And if so, on what terms? On the fiduciary duty? Mm-hmm. I'm sorry. Fiduciary duty. Yes. Well, on that, defendants basically argued, in effect, for a bright-line rule that an unpaid part-time intern- Let me jump to the conclusion for me, for me, please. If you lose, if the court- if we were to say your arguments on there being a fiduciary relationship are not supported by law, they're wrong, we reverse, are you still in play in the case as a whole, and on what terms? Yes. Well, there were two separate counts, yes. The wiretapping count depends on the existence of a fiduciary duty and required us to prove that there was a fiduciary duty and that she made the secret recordings for the purpose of reaching that duty. So if you were to find there was no duty, we would- that count would be- the verdict on that count- And you would still be in play. On fraudulent misrepresentation, which was a separate count, based on the misrepresentations again causing the damage by losing the infiltration. The bright line rule I just want to point out does not- it's not the law of D.C. and it doesn't make sense. Judge Wilkins alluded to congressional interns. The U.S. Attorney's Office here in D.C. offers unpaid part-time internships to undergraduate and law students and so do many state courts. Do those students, even in the absence of a nondisclosure agreement, not owe a duty of confidentiality and loyalty that would prevent them from secretly recording and disclosing internal deliberations, discussions with the judge or with their supervisors, draft opinions and the like? Of course not. And again, the evidence- Can you explain? I think they said she had to sign a nondisclosure agreement. Correct. That was the end of it. They never presented it, but there was evidence on a number of occasions and counsel alluded to some of them where she understood that what she was being given access to was to be confidential. There was a secret war room, that the clips she was doing would be seen by Hillary Clinton herself. So there was- Does the record show what she did with all this stuff she collected? Yes. The record show what she did with all the videos. Every night she- No, I mean, they weren't the video that involved Fogel or whatever his name is. The video that actually was published- She transmitted all the videos she talked to her project, to her supervisors at Project Veritas, and it was up to them what they put- What happened? The video. Nothing happened as far as the record reveals. Yeah, well, that's true. The tapes that she made, again, it wasn't- Absolutely was not responding to the contents of that tape. They were responding to the fact they learned that democracy partners had been infiltrated, and how could this happen? And that was the approximate cause. Any questions? Okay, thank you.  Thank you. Does counsel have any time left? All right, why don't you take two minutes? Thank you, Your Honors. To your point, Judge Edwards, we are asking a lot. I understand this is a unique case. This is about the borderline of protecting First Amendment rights as a constitutional gatekeeper under Bose. And to Judge Henderson's point, Claymore, Hustler both indicate juries get impassioned about these sorts of issues. They decide these issues wrong. And where the First Amendment is implicated, there is a role for this court to be involved, different from almost any other case that would be before this court. I just want to reemphasize that here. The finding of a fiduciary duty here is incredibly difficult and absurd in comparison to what we have shown nationwide and within D.C. in terms of precedent. There is absolutely no evidence from the record below of direct instructions from democracy partners about confidentiality. There are sparse mentions about things that are kind of secret. Indulge me if you would. What is your, in your view, what is your principal argument on the fraudulent misrepresentation part of the case? The harm. The fiduciary relationship. I understand your argument. Yes. That the intervening act of a publication from which harm stemmed means that they are evading New York Times v. Sullivan and that this court should deny that relief. New York Times v. Sullivan and Hustler act independently of Cohen. And so Cohen would say, if you can show that damages occurred in the infiltration, like they did at Newman where there was a causal relationship and it was timely, it happened right then, then they would be able to bring damages. They didn't act right then. They spent the whole weekend to prevent the publication. This is the death of the First Amendment. There were several fights going on, but that doesn't mean that your conclusion is the right conclusion. We believe that. And especially if you have proper jury instructions, which explain to the jury damages can be only awarded on these terms, have nothing to do with the publication. Shouldn't have gone to the jury. Juries get decisions wrong. And in cases implicating the First Amendment, where you were the evidence. Trying to make Boe's the law in all circumstances, it clearly is not. It's a limited rule. And if you look it up, the courts do not routinely put all these First Amendment cases in the Boe's category. That is not the law. And we are not suggesting,  to lightly do this. We are suggesting that the record below shows that the damages here are all tied to publication. That there is almost no evidence showing that it occurred from any sort of infiltration. The real question is whether the jury in this circumstances could reasonably separate it out as instructed and understand no damages could be given based on what was published. It had to be on the breach of the misrepresentation. If they couldn't do that, they were instructed you couldn't do it, right? I think it's the first point. No, it shouldn't have gone to the jury. It's your second point. So you're assuming they couldn't do it. You shouldn't even assume there's a possibility. That's what your assumption is.  Okay. But second, not reasonably that there would be clear and convincing evidence at that point. Thank you, Your Honor. We'd ask that you reverse and remove.
judges: Henderson; Wilkins; Edwards